# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# <u>JASPER DIVISION</u>

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | Case No. |
| v. ) | |
| ) | |
| **JOSHUA CONNER JONES** ) | |

## <u>PLEA AGREEMENT</u>

The Government and the defendant, **JOSHUA CONNER JONES**, hereby acknowledge the following plea agreement in this case:

## <u>PLEA</u>

The defendant agrees to (i) plead guilty to **COUNTS ONE** and **TWO** of the Information filed in the above-numbered and -captioned matter; (ii) stipulate to United States Sentencing Guideline §2A1.4(a)(2)(A)(Involuntary Manslaughter Involving Reckless Conduct)-18 Base Offense Level, and (iii) waive certain rights to direct appeal and collateral attack as outlined in section **IV** of this agreement. In exchange, the United States Attorney, acting on behalf of the Government and through the undersigned Assistant United States Attorney, agrees to recommend the disposition specified below, subject to the conditions in section **VII**.

Defendant's Initials ___

## TERMS OF THE AGREEMENT

**I.        MAXIMUM PUNISHMENT**

The defendant understands that the maximum statutory punishment that may be imposed for the crime of Conspiracy to Deprivation of Rights under Color of Law, in violation of Title 18, United States Code, Section 241, as charged in **COUNT ONE** is:

- A.   Imprisonment for not more than life imprisonment;
- B.   A fine of not more than $250,000.00, or;
- C.   Both (a and b);
- D.   Supervised release of not more than five years; and
- E.   Special Assessment Fee of $100 per count.

The defendant understands that the maximum statutory punishment that may be imposed for the crime of Deprivation of Rights under Color of Law, in violation of Title 18, United States Code, Section 242, as charged in **COUNT TWO** is:

- A.   Imprisonment for not more than ten years;
- B.   A fine of not more than $250,000.00, or;
- C.   Both (a and b);
- D.   Supervised release of not more than three years; and
- E.   Special Assessment Fee of $100 per count.

## II.     FACTUAL BASIS FOR PLEA

The Government is prepared to prove, at a minimum, the following facts at the trial of this case:

### A.     Deliberate Indifference to Individual #1's Medical Needs

On January 12, 2023, the Walker County Jail (Jail) was headed by the elected Sheriff, the Jail Administrator, the Captain, and officers who served as shift supervisors over two day shifts and two night shifts. Each shift was staffed by several officers who performed various duties related to the care, custody, and control of the pre-trial and post-conviction detainees housed there. In general, officers typically, worked 12-hour shifts on a rotation of 4 days on, 4 days off, 3 days on, 3 days off over the course of a two-week period.

While the Jail contained several dorms to house detainees, a limited number of inmates were held for limited periods in observation cells in the "Booking" area. Booking consisted of the Booking desk which formed the central hub of detainee intake, jail movement, communication, and operations. Eight booking cells could be directly observed by officers at the Booking desk several feet away. Among the eight Booking cells, BK5 was unique in that it was essentially a cement box with a small grate on the floor that opens into a hole for fluids to drain from the cell. Capable of being "flushed" only from outside of the cell, BK5 was often referred to as the drunk tank in that it could easily be hosed down when inebriated people held there would vomit. BK5 was unlike all other cells in the Jail, but for observation cell AH3, which had no hole in the floor and was used only for holding detainees for hours at a time.

BK5 did not have a sink, a toilet, access to any running water, or a raised platform to be used as a bed. Detainees housed in BK5 depended on officers to escort them to a toilet or shower and relied on officers to bring them water. BK5 was notoriously cold during winter months and the temperature on the bare cement floor was even colder. A small window was located on the top half of the cell door and a larger window covered the bottom half of the door. Again, this bottom window was unique among the observation cells, other than AH3, and offered considerably more opportunity for observation from the Booking desk than any of the other Booking cells.

Medical and mental health services were provided by an outside contractor hired by Walker County. As part of the booking process, all detainees booked into the jail were supposed to receive a medical and mental health screening to ensure that emergent and urgent health needs are met and to determine, among other things, their fitness for confinement. Jailers were trained that some time after the booking process was completed medical personnel would identify daily each detainee that needed to be seen by a nurse for an initial intake evaluation ("Initial Intake") or for ongoing consultation/evaluation, including providing approved medicine. For those detainees housed in Booking, nurses would rely on officers for assistance to provide necessary medical and mental health services, including escorts into the Jail's medical unit which was located just down a short hallway from Booking.

On January 12, 2023, Walker County Sherrif's deputies responded to the home of Individual #1 in response to a request that they conduct a mental health welfare check. Individual #1 was arrested after he allegedly fired a gun while deputies were on his property and officers on defendant **JONES'** Day shift were informed that Individual #1 was being brought in because "he shot at deputies."

Individual #1 was transported directly to the Jail in a patrol car that was met in the Jail's sallyport by correctional officers and supervisors including defendant **JONES**, CO-CONSPIRATOR #1, CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, CO-CONSPIRATOR #4, AND CO-CONSPIRATOR #5. Upon being removed from the patrol, car, Individual #1 could not walk or stand on his own. He was disoriented, non-combative, and could not follow instructions. These observations were obvious to everyone who removed Individual #1 from the car and defendant **JONES** believed that Individual #1 needed to be taken to a hospital or mental health facility rather than being incarcerated at the Jail.

Upon entry into the Jail, Individual #1 was taken to a dress-out room so that he could change from his street clothes into a jail uniform. He was sufficiently helpless that he was not capable of undressing or dressing himself. After several attempts by officers to struggle with putting on a jail uniform on Individual #1, officers simply wrapped a suicide smock around him (known as a "turtle" suit) without an indication that Individual #1 was suicidal, instructions that he be treated as if he was suicidal, or instructions that he needed to be naked for security reasons.

Thereafter, Individual #1 was taken by wheelchair to the medical unit which was attended by the Health Services Administrator, NURSE 1, and NURSE 2. At that time, NURSE 1 told defendant **JONES**, CO-CONSPIRATOR #2, CO-

CONSPIRATOR #3, AND CO-CONSPIRATOR #4 that "she wanted to wait," referring to instructions from CO-CONSPIRATOR #1 to deny the initial fit for confinement screening to Individual #1. Defendant **JONES**, CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, and CO-CONSPIRATOR #4 turned the wheelchair around, headed out of the medical unit, and placed Individual #1 into cell BK5.

To the best of defendant **JONES'** knowledge, Individual #1 never received any medical evaluation until the morning of his death, two weeks after he was arrested. Defendant **JONES** worked seven shifts during Individual #1's two-week incarceration and during that time none of the officers, including defendant **JONES**, made efforts to provide medical care for Individual #1 nor alter the conditions of his confinement. To the contrary, defendant **JONES,** CO-CONSPIRATOR #2, CO-CONSPIRATOR #3 and CO-CONSPIRATOR #4, actively denied medical access to Individual #1 by falsely telling medical staff that Individual #1 was too combative to be evaluated, when in truth that was not the case.

Calling Individual #1 "combative" was an excuse to mistreat him. There was no conduct that could have been committed by Individual #1 that would have justified the denial of medical access since the jail could manage or control any behavior that Individual #1 might have exhibited. The capabilities of the Jail to manage inmates were known and obvious to everyone who worked there, including medical staff who routinely examined or evaluated the needs of inmates who were in handcuffs or restraints of one kind or another. Moreover, Individual #1 was frailer than most other inmates whom JONES and his CO-CONSPIRATORS encountered.

The efforts to deny Individual #1 care persisted despite his obvious need for mental health and medical services. Individual #1 was frequently expressing severe mental health symptoms such as talking incoherently about "demons" and "portals." He was often covered in feces, which was an indication that he could not care for himself. Nearly every time defendant **JONES** saw Individual #1, he was on the floor and "looked really bad." Defendant **JONES** observed Individual #1 deteriorate over the course of his incarceration. As the time passed, Individual #1 was almost always naked, wet, cold, and covered in feces while lying on the cement floor without a mat or blanket. By the second week of incarceration, Individual #1 was largely listless and mostly unresponsive to questions from officers. Nonetheless, neither defendant **JONES**, nor any of the CO-CONSPIRATORS took steps to alter the conditions in which Individual #1 was housed despite Individual #1's obvious suffering.

Defendant's Initials JC

Despite the obviousness of Individual #1's need to any and all who saw him at any time during his incarceration, defendant **JONES** and his co-conspirators actively chose not to provide care to Individual #1. At least once during each shift, either defendant **JONES**, or CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, or CO-CONSPIRATOR #4, would comment on Individual #1's condition and some member of the conspiracy would dismiss Individual #1's needs by saying: "Fuck him, he gets what he gets since he shot at cops," or words to that effect.

Moreover, defendant **JONES** and these CO-CONSPIRATORS repeatedly made comments during the first few days of Individual #1's detention to the effect of Individual #1 should have been killed because he shot at deputies rather than being brought to the Jail, that they would have killed him if they were the ones responding to the welfare check, and that road deputies should have killed him rather than making the correctional officers have to deal with incarcerating him.  At times, defendant **JONES** and these CO-CONSPIRATORS spoke directly to Individual #1, saying that he was now in their "house," and that he had to deal with them (the officers). None of the CO-CONSPIRATORS, regardless of rank or seniority, objected to or discouraged the comments from continuing. To the contrary, these comments and comments like them continued amongst officers on this and other shifts and reflected the indifference showed to Individual #1's serious medical and other needs throughout his incarceration.

At the beginning of his shift on January 26, 2023, around 6:00 am, CO-CONSPIRATOR #5, told defendant **JONES** that a nurse had seen Individual #1 in the early morning hours and ordered that Individual #1 be transported to a hospital and that the transport should take place as soon as possible. The same message was conveyed by other officers to CO-CONSPIRATOR #2 in the presence of defendant **JONES** and others.

Those officers were insistent in telling CO-CONSPIRATOR #2 that the nurse said Individual #1 could die if he was not taken to the hospital to the point of repeating the message a second time to CO-CONSPIRATOR #2 after CO-CONSPIRATOR #2 dismissed the concerns initially expressed. In response to the second effort by those officers, CO-CONSPIRATOR #2 replied: "I'll tell you what, next time you're on the toilet taking a shit, I'll call you to bother you with something unimportant," or words to that effect.

According to defendant **JONES**, CO-CONSPIRATOR #1 AND CO-CONSPIRATOR #2, both with supervisory positions at the Jail, failed to arrange for

Individual #1 to be transported to the hospital for more than 3 hours after officers reported the nurse's instructions and the urgent need to do so. After defendant **JONES** transported several detainees to court that morning, he was instructed to join other officers at Walker Baptist Medical Center Hospital where Individual #1 had been transported by fellow officers in the back of a patrol car, rather than by ambulance. Upon arrival, he learned that Individual #1's mother had been called to the emergency room and overheard her giving permission to medical staff to remove Individual #1 from life support.

Defendant **JONES** admitted that "collectively we did it. We killed him."

### B. The Assault of Individual #2

On September 26, 2022, Individual #2 was a pre-trial detainee held in A-Dorm of the Walker County Jail (Jail). Defendant **JONES** and OFFICER A were working as correctional officers on one of the day shifts. As part of their duties, defendant **JONES** and OFFICER A were moving an inmate from D-Dorm into a cell in A-Dorm. Despite the availability of other housing, OFFICER A insisted on placing inmate in a cell with Individual #2 and two other inmates, which would have caused the cell to be unnecessarily crowded. When Individual #2 complained, OFFICER A purposely antagonized Individual #2, by yelling at him and placing him against a wall in the cell and striking him without cause. At the time, Individual #2 was argumentative, but was posing no threat to either defendant **JONES**, OFFICER A, or the other inmates.

In response to Individual #2's arguing, and to support OFFICER A's antagonism toward Individual #2, defendant **JONES** struck Individual #2 in the face three times with a can of O.C. spray that he carried with him. At the time, no force was necessary to manage Individual #2 or any other inmate and striking Individual #2 in the face three times with a metal can was unjustified. The lever or trigger on the can broke with the force of the blows and O.C. spray was dispersed throughout the cell irritating Individual #2, the other inmates, JONES, and OFFICER A, and required de-contamination of all involved.

Thereafter, defendant **JONES** and OFFICER A wrote identical false reports designed to cover up OFFICER A's unnecessary provocation and defendant **JONES'** unnecessary use of force. The reports falsely indicated that Individual #2 advanced on OFFICER A in way that justified using force against him; that Individual #2 attempted to strike OFFICER A such that force would have been

justified to subdue Individual #2; and that defendant **JONES** blocked Individual #2's intended attack on OFFICER A with his O.C. cannister, thereby damaging the cannister, and causing the O.C. dispersal. Each of these allegations was untrue and was written to hide the unjustified use of force against Individual #2.

**The defendant hereby stipulates that the facts stated above are substantially correct and that the Court can use these facts in calculating the defendant's sentence. The defendant further acknowledges that these facts do not constitute all the evidence of each and every act that the defendant and/or any co-conspirators may have committed.**

_____
JOSHUA CONNER JONES

### III. RECOMMENDED SENTENCE

Subject to the limitations in section **VII** regarding subsequent conduct and pursuant to Fed. R. Crim. P. 11(c)(1)(B), the Government will recommend the following disposition:

- A. That the defendant be awarded a two (2) level reduction in the defendant's adjusted offense level, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the defendant's criminal conduct. The Government agrees to make a motion pursuant to USSG §3E1.1(b) for an additional one-level decrease in recognition of the defendant's prompt notification to the Government of the intention to enter a plea of guilty. The Government may oppose any adjustment for acceptance of responsibility if the defendant: (1) fails to admit each and every item in the factual stipulation; (2) denies involvement in the offense; (3) gives conflicting statements about the defendant's involvement in the offense; (4) is untruthful with the Court, the Government, or the

Defendant's Initials JCJ

United States Probation Officer; (5) obstructs or attempts to obstruct justice prior to sentencing; (6) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (7) attempts to withdraw the defendant's plea of guilty for any reason other than those expressly enumerated in the "Waiver of Right to Appeal and Post-Conviction Relief" section of this Plea Agreement;

B. That the defendant be remanded to the custody of the Bureau of Prisons and incarcerated for a term consistent within the advisory United States Sentencing Guideline range as calculated by the Court at the time of sentencing;

C. That following said term of imprisonment, the defendant be placed on supervised release for a period to be determined by the Court, subject to the Court's standard conditions of supervised release;

D. That the defendant be required to pay a fine in accordance with the sentencing guidelines should the Court determine that the defendant has the ability to pay a fine, said amount due and owing as of the date sentence is pronounced, with any outstanding balance to be paid in full by the expiration of the term of supervised release; and,

E. That the defendant pay a special assessment of $200.00, said amount due and owing as of the date sentence is pronounced.

IV. **WAIVERS**

A. **STATUTE OF LIMITATIONS WAIVER**

**In consideration of the recommended disposition of this case, I, JOSHUA CONNER JONES, hereby understand, acknowledge, and agree that if this plea agreement is set aside for any reason, I will not assert any defense based on any applicable statute of limitations or the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, that includes the passage of time from and including the date of this plea**

agreement until and including the date of entry of any order setting this plea agreement aside.

  **B. RIGHT TO APPEAL AND POST-CONVICTION RELIEF**

  In consideration of the recommended disposition of this case, I, JOSHUA CONNER JONES, hereby waive and give up my right to appeal my conviction and/or sentence in this case, as well as any fines, restitution, and forfeiture orders, the Court might impose. Further, I waive and give up the right to challenge my conviction and/or sentence, any fines, restitution, forfeiture orders imposed or the manner in which my conviction and/or sentence, any fines, restitution, and forfeiture orders were determined in any post-conviction proceeding, including, but not limited to, a motion brought under 28 U.S.C. § 2255, and any argument that (1) the statute(s) to which I am pleading guilty is or are unconstitutional or (2) the admitted conduct does not fall within the scope of the statute(s).

  The defendant reserves the right to contest in an appeal or post-conviction proceeding(s) the following:

   1. Any sentence imposed in excess of the applicable statutory maximum sentence(s);

   2. Any sentence imposed in excess of the Guidelines range determined by the Court at the time sentence is imposed; and

   3. Ineffective assistance of counsel.

The defendant acknowledges that before giving up these rights, the defendant discussed the United States Sentencing Guidelines and their application to the defendant's case with the defendant's attorney, who explained them to the defendant's satisfaction. The defendant further acknowledges and understands that the Government retains its right to appeal where authorized by statute.

C. **WAIVER OF RULE 410, RULE 11, AND SECTION 1B1.8(a)**

Defendant agrees that if he fails to comply with any of the provisions of this agreement, including the failure to tender such agreement to the district court, or attempts to withdraw the plea (prior to or after pleading guilty to the charges identified in the agreement), the government will have the right to characterize such conduct as a breach of the agreement. In the event of such a breach, the defendant waives any protections afforded by Section 1B1.8(a) of the Sentencing Guidelines, Rule 11 of the Federal Rules of Criminal Procedure, and Rule 410 of the Federal Rules of Evidence, and the government will be free to use against the defendant, directly and indirectly, in any criminal or civil proceeding any of the information, statements, and materials provided by him pursuant to this agreement, including offering into evidence or otherwise using the attached Agreed Factual Basis for Guilty Plea.

I, JOSHUA CONNER JONES, hereby place my signature on the line directly below to signify that I fully understand the foregoing paragraphs, and that I am knowingly and voluntarily entering into this waiver.

_____
JOSHUA CONNER JONES

### V. UNITED STATES SENTENCING GUIDELINES

The defendant's counsel has explained to the defendant, that in light of the United States Supreme Court's decision in *United States v. Booker*, the federal sentencing guidelines are **advisory** in nature. Sentencing is in the Court's discretion and is not required to be within the guideline range. The defendant agrees that, pursuant to this agreement, the Court may use facts it finds by a preponderance of the evidence to reach an advisory guideline range, and the defendant explicitly waives any right to have those facts found by a jury beyond a reasonable doubt.

### VI. AGREEMENT NOT BINDING ON COURT

The defendant fully and completely understands and agrees that it is the Court's duty to impose sentence upon the defendant and that any sentence recommended by the Government is **NOT BINDING UPON THE COURT,** and that the Court is not required to accept the Government's recommendation. Further, the defendant understands that if the Court does not accept the Government's recommendation, the defendant does not have the right to withdraw the guilty plea.

VII. **VOIDING OF AGREEMENT**

The defendant understands that if the defendant (a) violates any federal, state, or local law or any condition of pretrial release after entering into this plea agreement, (b) moves the Court to accept a plea of guilty in accordance with, or pursuant to, the provisions of *North Carolina v. Alford*, 400 U.S. 25 (1970), (c) tenders a plea of *nolo contendere* to the charges, (d) violates any other term of this plea agreement, and/or (e) does or says anything that is inconsistent with the acceptance of responsibility, the plea agreement will become NULL and VOID at the election of the United States, and the United States will not be bound by any of the terms, conditions, or recommendations, express or implied, which are contained herein. Further, such election will not entitle the defendant to withdraw a previously entered plea.

VIII. **OTHER DISTRICTS AND JURISDICTIONS**

The defendant understands and agrees that this agreement **DOES NOT BIND** any other United States Attorney in any other district, or any other state or local authority.

IX. **COLLECTION OF FINANCIAL OBLIGATION**

To facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees to:

- fully disclose all assets in which the defendant has any interest or over which

the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party;

- promptly submit a completed financial statement to the United States Attorney's Office, in a form that it provides and as it directs;

- identify all assets over which the defendant exercises or exercised control, directly or indirectly, within the past five years, or in which the defendant has or had during that time any financial interest;

- take all steps as requested by the Government to obtain from any other parties by any lawful means any records of assets owned at any time by the defendant;

- undergo any polygraph examination the Government may choose to administer concerning such assets and to provide and/or consent to the release of the defendant's tax returns for the previous five years.

The defendant further agrees that the above information, as well as any of the defendant's financial statements and disclosures, will be complete, accurate, and truthful. Finally, the defendant expressly authorizes the United States Attorney's Office to obtain a credit report on the defendant to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

X.  **AGREEMENT REGARDING RELEVANT CONDUCT AND RESTITUTION**

As part of the defendant's plea agreement, the defendant admits to the above facts associated with the charges and relevant conduct for any other acts. The defendant understands and agrees that the relevant conduct contained in the factual basis will be used by the Court to determine the defendant's range of punishment under the advisory sentencing guidelines. The defendant admits that all the crimes listed in the factual basis are part of the same acts, scheme, and course of conduct. This agreement is not meant, however, to prohibit the United States Probation Office or the Court from considering any other acts and factors, which may constitute or relate to relevant conduct. Additionally, if this agreement contains any provisions providing for the dismissal of any counts, the defendant agrees to pay any appropriate restitution to each of the separate and proximate victims related to those counts should there be any and waives objection to the inclusion of that restitution in any order issued by the Court.

XI.  **TAX, FORFEITURE AND OTHER CIVIL/ADMINISTRATIVE PROCEEDINGS**

Unless otherwise specified herein, the defendant understands and acknowledges that this agreement does not apply to or in any way limit any pending or prospective proceedings related to the defendant's **tax liabilities**, if any, or to any pending or prospective **forfeiture** or other **civil** or **administrative** proceedings.

XII.    **IMMIGRATION STATUS**

The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense(s) to which the defendant is pleading guilty. The defendant's guilty plea and conviction make it practically inevitable and a virtual certainty that the defendant will be removed or deported from the United States if the defendant is not a citizen of the United States. Removal and other immigration consequences are the subject of a separate proceeding, however; and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Understanding all of this, the defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences that plea may entail, even if the consequence is automatic removal from the United States.

XIII.   **DEFENDANT'S ACKNOWLEDGEMENT**

I have read and understand the provisions of this plea agreement consisting of eighteen (18) pages. I have discussed the case and my constitutional and other rights with my lawyer. I am satisfied with my lawyer's representation in this case. I understand that by pleading guilty, I will be waiving and giving up my right to continue to plead not guilty, to a trial by jury, to the assistance of counsel at that trial,

to confront, cross-examine, or compel the attendance of witnesses, to present evidence on my behalf, to maintain my privilege against self-incrimination, and to the presumption of innocence. I agree to enter my plea as indicated above on the terms and conditions set forth herein.

**NO PROMISES OR REPRESENTATIONS OTHER THAN THOSE IN THE AGREEMENT HAVE BEEN MADE TO ME BY THE PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED TO INDUCE ME TO PLEAD GUILTY.**

I further state that I have not had any drugs, medication, or alcohol within the past 48 hours except as stated here:

None

I understand that this plea agreement will take effect and will be binding as to the Parties **only** after all necessary signatures have been affixed hereto.

I have personally and voluntarily placed my initials on every page of this plea agreement and have signed the signature line below to indicate that I have read, understand, and approve all the provisions of this plea agreement, both individually and as a total binding agreement.

7/21/24
DATE

_____
**JOSHUA CONNER JONES**
Defendant

XIV. **COUNSEL'S ACKNOWLEDGMENT**

I have discussed this case with my client in detail and have advised my client of all my client's rights and all possible defenses. My client has conveyed to me that my client understands this plea agreement and consents to all its terms. I believe the plea and disposition set forth herein are appropriate under the facts of this case and are in accord with my best judgment. I concur in the entry of the plea agreement on the terms and conditions set forth herein.

7-31-24
DATE

SCOTT BROWER
Defendant's Counsel

XV. **GOVERNMENT'S ACKNOWLEDGMENT**

I have reviewed this matter and this plea agreement and concur that the plea and disposition set forth herein are appropriate and are in the interests of justice.

PRIM F. ESCALONA
United States Attorney

7/29/24
DATE

MICHAEL A. ROYSTER
Assistant United States Attorney

7/29/24
DATE

GEORGE A. MARTIN, JR.
Assistant United States Attorney

Page 18 of 18                Defendant's Initials SJS